UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MERITAGE HOMES OF TEXAS, LLC, MERITAGE HOMES OF FLORIDA, INC., and MERITAGE HOMES CORPORATION, | § § § § § | No. 1:22-CV-1375-DAE |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | |
| | § | |
| AIG SPECIALTY INSURANCE COMPANY f/k/a CHARTIS SPECIALTY INSURANCE COMPANY, f/k/a AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, | § § § § § § § | |
| | § | |
| *Defendant*. | § | |
| | § | |

ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
PARTIAL MOTION FOR SUMMARY JUDGMENT; AND (2) DENYING IN
PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

Before the Court are a Partial Motion for Summary Judgment filed by

Plaintiffs Meritage Homes of Texas, LLC, Meritage Homes of Florida, Inc., and

Meritage Homes Corporation (collectively "Plaintiffs" or "Meritage") (Dkt. # 62)

and a Motion for Summary Judgment filed by Defendant AIG Specialty Insurance

Company f/k/a Chartis Specialty Insurance Company, f/k/a American International

Specialty Lines Insurance Company ("AIG") (Dkt. # 61). Both Motions were filed

1

on February 4, 2025, and, after the parties sought and the Court granted an extension for the time to file responses and replies, the Motions became ripe for consideration on March 14, 2025.

The Court finds this matter suitable for disposition without a hearing. After careful consideration of the parties' briefs and the relevant law, the Court **GRANTS IN PART** and **DENIES IN PART** Meritage's motion and **DENIES IN PART** and **GRANTS IN PART** AIG's motion.

## BACKGROUND

I.    Factual Background

Plaintiffs Meritage Homes of Texas, LLC, Meritage Homes of Florida, Inc., and Meritage Homes Corporation (collectively, "Meritage") bring this insurance coverage lawsuit against general liability insurer AIG Specialty Insurance Company, f/k/a Chartis Specialty Insurance Company, f/k/a American International Specialty Lines Insurance Company ("AIG"). AIG issued umbrella insurance policies to Meritage that apply in excess of self-insured retentions ("SIRs"). (Dkt. # 61 at 1.) The policies were issued from 2003 to 2018 and twelve policies are at issue in this lawsuit. (Dkt. # 62 at 7.) At issue in this case are over a thousand stucco system construction defect claims asserted against Meritage, a national residential homebuilder, by homeowners in Texas and Florida (the "stucco claims"). (Dkt. # 62 at 2.) As discussed further below, Meritage seeks declarations that the stucco claims involve "property damage" caused by a single "occurrence"

2

as those terms are defined by the AIG policies, and that Meritage has satisfied its SIR, resulting in an obligation by AIG to indemnify Meritage.

In 2015, owners of residential stucco homes in Florida began to assert construction defect claims against Meritage, and in 2019, homeowners in Texas began to assert stucco claims against Meritage. (Id. at 7.) As of January 31, 2025, 1,154 stucco system claims have been asserted against Meritage in Florida. (Id.) Of those, 601 have been settled by Meritage by payment made to either the Florida homeowners or their attorneys. (Id.) To date, 220 stucco claims have been asserted against Meritage in Texas. (Id. at 8.) Of those, 23 claims have been settled by Meritage by payment made to either the Texas homeowners or their attorneys. (Id.) The parties appear to agree that the settlements totaled more than $11 million, (See Dkts. ## 61 at 11, 62 at 9.) However, a key point of contention between the parties in the instant motions is that Meritage later recovered approximately $11 million in funds based on the settlement amounts paid to homeowners from subcontractors or subcontractors' insurer's, pursuant to third-party agreements Meritage had with its subcontractors. (Dkts. ## 61 at 11–12, 62 at 10.)

## II.    The Policies

AIG issued 12 consecutive Homebuilders Umbrella policies to Meritage in effect from 10/1/2005 to 10/1/2018 (the "Policies"). (Dkt. # 62 at 3.) The policies apply in excess of self-insured retentions that range from $1 million to

3

$3 million, and certain policies allow defense costs to reduce a portion of the SIR

(Id.)

    A.    <u>Insuring Agreement</u>

    The Policies[1] contain the following Insuring Agreement, quoted below

in relevant part:

**I.    INSURING AGREEMENT: EXCESS LIABILITY OVER INSURED'S SELF-INSURED RETENTION AND SCHEDULED UNDERLYING INSURANCE**

**A. Coverage A: Excess Liability Over Insured's Self-Insured Retention.**

We will pay on behalf of the **Insured** those sums in excess of the **Self-Insured Retention** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law because of **Bodily Injury, Property Damage,** or **Personal Injury and Advertising Injury** to which this insurance applies. . .

\* \* \* \* \*

C. This policy applies, only if:
1. a. the Bodily Injury or Property Damage is caused by an Occurrence that takes place anywhere, and the Bodily Injury or Property Damage occurs during the Policy Period, or

b. the Bodily Injury or Property Damage occurred after the end of the Policy Period and within the applicable statute of limitations or within twelve (12) years, whichever is less, from:

\*\*\*\*\*

---

[1] The policies contain substantially similar provisions except where noted as divergent. (Dkt. # 61 at 4.)

the Unit close of escrow, and arising out of a Unit, the deed or title to which
was recorded in accordance with applicable law in the name of the original
third party purchaser during the Policy Period, or . . .

*****

(Dkt. # 62 at 11–12.)

Thus, there are four prongs of the Insurance Agreement that must be
satisfied in order to establish coverage for the stucco claims: (1) the existence of
"property damage"; (2) caused by an "occurrence"; (3) the "property damage"
must occur during the relevant policy period or within a certain period of time after
the policy period if the home effectively closed escrow during the policy period;
and (4) satisfaction of the SIR.

B.    Relevant Definitions Under the Policies

"Property damage" includes "1. physical injury to tangible property,
including all resulting loss of use of that property. . . ."  (Dkt. # 61 at 5.)

"Occurrence" means "[a]s respects . . . **Property Damage**, an
accident, including continuous or repeated exposure to substantially the same
general harmful conditions, which results in . . . **Property Damage**. . . . In the
event of continuing or progressively deteriorating damage over any length of time,
such damage shall be one **Occurrence** and shall be deemed to occur only when
such damage first commences."  (Id.)

"Unit" means "a home, townhouse, or condominium, built by an Insured or financed by an Insured and sold, given away or otherwise transferred by the Named Insured to an unrelated third party."  (Id. at 6.)

The Policies define "Self-Insured Retention" as "the amount applicable to each Occurrence for which the Insured is responsible."  (Id. at 4.)

C.     Single Occurrence Clause Endorsements

Beginning in 2008, the Policies include a Single Occurrence Clause ("SOC") and that clause (the "first SOC endorsement"), as written also appeared in the 2009 policy.  (Dkt. # 61 at 6.)   The 2011 to 2017 policies have a modified SOC endorsement (the "second SOC endorsement" or "SOC endorsement").  (Id. at 7.) The second SOC endorsement provides:

> TO THE EXTENT THE TERMS OR CONDITIONS OF THIS ENDORSEMENT CONFLICT WITH THE TERMS OR CONDITIONS OF THE POLICY TO WHICH IT IS ATTACHED OR THE POLICY'S OTHER ENDORSEMENTS, THE TERMS AND CONDITIONS OF THIS ENDORSEMENT SHALL SUPERSEDE
>
> This policy is amended as follows:
>
> > As respects . . . **Property Damage,** one or more accidents arising out of a single act or causes within a community or a series of related acts or causes, regardless of the number of affected communities shall be treated as a single **Occurrence** and all related . . . **Property Damage** arising out of such **Occurrenc**e shall be deemed to have taken place only at the time at which the first such accident took place. It is agreed that an accident includes any unexpected or unforeseen event arising out of the **Named Insured's** operations as a homebuilder, construction contractor, [or] construction developer which results in . . . **Property Damage** otherwise covered. Where such Occurrence

arises out of or affects one or more **Units** or **Common Areas** for which the Insured has paid us a premium to cover under a policy of insurance and which closed escrow during our **Policy Period** or the policy period of any policy issued by us to which this policy serves as a renewal or succeeds in time, all such damage shall be deemed to take place during our first policy period during which such damage first commenced.

In the event of continuing or progressively deteriorating damage over any length of time arising out of or affecting one or more **Units** or **Common Areas** for which the **Insured** has paid us a premium to cover under a policy of insurance and which closed escrow during our **Policy Period** or the policy period of any policy issued by us to which this policy serves as a renewal or succeeds in time, all such damage shall be deemed to take place during our first policy period during which such damage first commenced.

In no event shall the assertion of claims based upon one or more accidents or continuing or progressive damages as described in the preceding paragraphs increase the limits of insurance available for a single **Occurrence** or the single **Self Insured Retention** applicable to such single **Occurrenc**e under this policy.

## III.   Coverage Dispute History

In April 2018, Meritage notified AIG of the Florida stucco claims and began to provide a rolling production of documents about the claims, and in December 2020, AIG issued a letter to Meritage including reservations of rights regarding the Florida stucco claims and setting forth a proposed method of allocating the claims to the policies for purposes of reducing the SIRs.  (Dkt. # 61 at 10.)  AIG's December 2020 letter advised that AIG intended to treat all Florida stucco claims concerning units that closed escrow during each respective policy period as a single occurrence, subject to each policy's SIR (one occurrence per

policy period).  (Id.)  In June 2021, Meritage gave AIG notice of the Texas stucco

claims against it.  (Id. at 11.)  In June 2022, Meritage responded to AIG's

December 2020 letter, contending that  Meritage believed only the 2017–18 policy

applied because "[w]hile the damage on almost all of the homes commenced in

earlier years, given the progressive nature of the damage it necessarily continued

on all such homes into the 10/1/17-18 policy year."[2]  (Id.)  Further, Meritage

asserted that the second SOC endorsement in the 2017 policy rendered all stucco

claims a single occurrence with the property damage relating back to some point

during the 2008 to 2014 policies.  (Id.)

IV.    Relief Sought

        There is a dispute among the parties as to AIG's coverage obligations

for the stucco claims. Accordingly, in its Second Amended Complaint Meritage

brings a declaratory judgment action under 28 U.S.C. §2201 seeking judicial

resolution of the disagreements and uncertainties regarding the rights and

obligations of the parties under the Policies.  Meritage seeks declaratory judgments

that, under the terms of the Policies: (1) the stucco claims involve property damage

(2) caused by an occurrence, (3) that the requisite property damage occurred either

---

[2] Meritage's retained expert, forensic architect and general contractor, Gregory
Zier, has opined that the stucco defects would have occurred during construction,
and that within a short time after construction/close of escrow, consequential and
resultant damage would have commenced to each unit, and such damage would
continue and progress until the defects were repaired.  (Dkt. # 61 at 9.)

in fact or as a result of operating policy language during the final 2017–18 policy period, and (4) that all relevant stucco claims constitute a *single* occurrence and therefore will be deemed to have occurred during the 2008–09 to 2014–15 Policies. (See Dkt. # 34.)  Meritage also seeks a declaration that  payment of settlements, adverse judgments or arbitration rulings, and in some instances, fees or expenses to defend any Suit or investigate Loss, qualify as "Loss" under the Policies, and therefore properly serve to erode the applicable SIR under the Policies.  Finally, Meritage seeks a declaration that AIG's indemnity obligations to Meritage are presently and fully triggered under any one of the AIG Policies issued during the 2008–09 to 2014–15 policy periods for (1) any settlement already effected on the stucco claims, (2) to be effected on the stucco claims, or (3) any adverse judgment or arbitration ruling that may be entered or issued against Meritage on the stucco claims.

In addition, Meritage's Complaint brings a breach of contract claim, arising from AIG's refusal to participate in settlement negotiations or fund any settlements as it relates to certain stucco claims relating to subcontractors in Florida that are effectively uninsured and have no assets.  Meritage contends that AIG has committed contractual breach as it relates to 32 settlements of Florida stucco claims, totaling an amount of $624,375.

AIG has denied Meritage's allegations and filed counterclaims seeking declaratory judgments regarding how the stucco claims should be allocated between the various policies, the number of occurrences and per-occurrence SIRs, and its obligations under the policies.  (Dkt. # 38.)

The parties have filed cross-motions for summary judgment.

## LEGAL STANDARD

I.    Summary Judgment

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  A genuine issue exists "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251–52.  The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

At the summary judgment stage, the court draws all reasonable inferences in the light most favorable to the nonmoving party. Wease v. Ocwen Loan Servicing, LLC, 915 F.3d 987, 992 (5th Cir. 2019). However, "unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012).

The interpretation of an unambiguous insurance policy is a question of law and is therefore appropriate for summary judgment. See Royal Ins. Co. of Am. v. Hartford Underwriters Ins. Co., 391 F.3d 639, 641 (5th Cir. 2004). If the policy is ambiguous and raises a material issue of fact, however, summary judgment is not proper. Amoco Prod. Co. v. Texas Meridian Res. Exploration Co., Inc., 180 F.3d 664, 669 (5th Cir.1999).

II.    Contract Interpretation

In Texas, insurance policies are interpreted by the same principles as other contracts.[3] See State Farm Lloyds v. Page, 315 S.W.3d 525, 527 (Tex. 2010).

---

[3] The stucco claims involve units in Florida and Texas. The Policies were issued to Meritage in Arizona and Texas. Federal courts exercising diversity jurisdiction apply state substantive law. Krieser v. Hobbs, 166 F.3d 736, 739 (5th Cir. 1999). Courts sitting in Texas presume Texas law applies unless a party seeking to apply the law of another interested state shows that it conflicts with Texas law. Urban Oaks Builders LLC v. Gemini Ins. Co., 2021 WL 4440322, at *2 (S.D. Tex. June 17, 2021).

The primary goal is to determine the contracting parties' intent through the policy's written language.  Id.

When the interpretation of a contract is at issue, the trial court must determine whether the provisions in question are ambiguous.  Nicol v. Gonzales, 127 S.W.3d 390, 394 (Tex. App.—Dallas 2004, no pet.) (citing Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983) ).  Ambiguity is a question of law for the court to decide. Tremont LLC v. Halliburton Energy Servs., Inc., 696 F. Supp. 2d 741, 839–40 (S.D. Tex. 2010) (citing Coker, 650 S.W.2d at 393); Nat'l Union Fire Ins. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995) (citations omitted).  The court's ambiguity determination is made by looking at the contract as a whole in light of the circumstances present when the parties entered the contract and the contract's express language.  Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., 341 S.W.3d 323, 333 (Tex. 2011).  When considered as a whole, a contract is ambiguous only if "its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning." Coker, 650 S.W.2d at 393 (citation omitted).  "If a contract is worded in such a manner that it can be given a definite or certain legal meaning, then it is not ambiguous." Friendswood Dev. Co. v. McDade & Co., 926 S.W.2d 280, 282 (Tex. 1996) (citing Nat'l Union, 907 S.W.2d at 520; Coker, 650 S.W.2d at 393).

"Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity." Tex. v. Am. Tobacco Co., 463 F.3d 399, 407 (5th Cir. 2006) (citing Sun Oil Co. v. Madeley, 626 S.W.2d 726, 732–33 (Tex. 1982); Gen. Accident Ins. Co. v. Unity/Waterford–Fair Oaks, Ltd., 288 F.3d 651, 657 (5th Cir. 2002) ).  Lack of clarity or inartful drafting will not alone render an agreement ambiguous.  In re D. Wilson Const. Co., 196 S.W.3d 774, 781 (Tex. 2006) (citation omitted); Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A., 121 S.W.3d 742, 746 (Tex. 2003); DeWitt Cnty. Elec. Co–op., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex. 1999).  A contract is also not ambiguous simply because the parties disagree over its meaning and advance conflicting interpretations of it.  Dynegy Midstream Servs., Ltd. P'hip v. Apache Corp., 294 S.W.3d 164, 168 (Tex. 2009).[4]

DISCUSSION

I.    Meritage's Partial Motion for Summary Judgment

    A.    Property Damage

Meritage first argues that it is entitled to summary judgment on its request for a declaration that the stucco claims involve "property damage" as defined under the Policies.  AIG does not appear to contest this request, and instead

---

[4]The parties assert that the Policies are unambiguous, with each side contending its interpretation is supported by the unambiguous language of the text.

focuses its efforts on arguing for summary judgment in its favor on its counter-claims for declaratory relief.

Under Texas law, as long as there is "physical injury" to a home or one of its components, "property damage" exists. Lamar Homes, Inc. v. Mid-Continent Casualty Co., 242 S.W.3d 1, 10, 21 (Tex. 2007). According to the uncontroverted report of Meritage's inspection expert, Greg Zier, each of the stucco claims involves allegations and observed damage to the stucco system component of the homes, including cracking, bulging, gaps at dissimilar materials, corroded lath and paint deterioration. (Dkt. # 62 at 14.) Accordingly, the "property damage" prong of the Insuring Agreement is met, and the Court finds that Meritage is entitled to summary judgment in the form of a declaration that each home at issue in the stucco claims involves "property damage" under the Policies.

B.    Occurrence

Next, Meritage contends it is entitled to summary judgment on its request for a declaration that the stucco claims meet the definition of an "occurrence" under the Policies. AIG also does not appear to contest this request.

In Lamar Homes, the Texas Supreme Court also addressed the issue of whether defective construction claims constitute an "occurrence" under a standard Commercial General Liability policy containing virtually the same definition as the Policies in this case. The court answered the question in the affirmative, holding

14

that unintended construction defects may constitute an "accident" or "occurrence."
Lamar Homes, 242 S.W.3d at 16.  Here, the stucco claims concern only accidental
and unexpected acts of defective faulty workmanship on the homes at issue.  (Dkt.
# 62 at 15.)  Accordingly, the Court finds that the "occurrence" prong of the
Insuring Agreement is satisfied, and Meritage is entitled to summary judgment in
the form of a declaration that each home at issue in the stucco claims involves an
"occurrence" under the Policies.

      C.    Continuous Property Damage During the 2017–18 Policy

      Meritage further seeks summary judgment on its request for a
declaration that property damage on all stucco claims commencing prior to
October 1, 2018 "was either occurring in fact or as a result of operative policy
language during the final 10/1/17-18 AIG policy period."  (Dkt. # 34 at 14.) AIG
appears to acknowledge that property damage continued into the 2017–18 period
and instead, as discussed below, contends that this conclusion is not relevant to the
determination of which policy applies to which claims.

      As outlined above, the Policies require any "property damage" occur
either during the applicable policy period or within a certain period of time after
policy expiration (10 or 12 years, depending on the policy) if the home effectively
closed escrow during the policy period.  Meritage's expert, Mr. Zier, concluded
that continuous and progressive "property damage" on all stucco claim homes

inspected by him continued to occur during the final 2017–18 AIG policy period. (Dkt. # 62 at 16.)  Additionally, the Court agrees with Meritage that for homes that closed escrow late in the 2017–18 period, any "property damage" that may have occurred after the AIG coverage expired will be deemed by the policy language to have occurred within the 2017–18 policy.  Accordingly, the Court finds that Meritage is entitled to summary judgment in the form of a declaration that "property damage" on all inspected stucco claim homes which closed escrow prior to October 1, 2018 was occurring in fact or as a result of operative policy language during the final 2017–18 AIG policy.

D.    Batching of Related Stucco Claims into a Single Occurrence

In the Court's view, the core dispute at the heart of the parties' cross-motions for summary judgment concerns the impact of the second SOC (single occurrence clause) endorsement on all stucco claims that occurred (or are deemed to have occurred) during the 2017–18 policy.  Meritage contends that the SOC endorsement deems all "continuing or progressively deteriorating damage" (in this case, the various stucco claims) a single occurrence, to be deemed to have occurred when damage first commenced on any unit whose escrow closed during the first AIG policy period for that project.  Meritage argues that all underlying stucco claims stem from a consistent defective installation practice (specifically a failure to comply with two ASTM construction standards, C 926 and C 1063) and that the

16

SOC clause is clear and unambiguous.  (See Dkt. # 68 at 11.)  Meritage's interpretation would require that only one SIR be satisfied, as it contends there is only once "occurrence" at issue.

AIG argues that the underlying stucco claims should first be segregated by policy year, according to the close of escrow (COE).  It further argues that the SOC endorsement results in the claims relating to Florida and Texas homes being batched into separate "occurrences."  As a result, AIG's interpretation would require Meritage to satisfy a discrete SIR for each of these occurrences, one per policy year for the years in which only Florida claims are implicated, and two per year once both Texas and Florida claims are implicated.  Thus, under AIG's interpretation, Meritage would need to satisfy $1 to 3 million in SIR per occurrence.  AIG also argues that the SOC clause is unambiguous.

The relevant excerpt of the 2017–18 SOC endorsement, the full text of which is included in the background section above, is included below:

> As respects **Bodily Injury** or **Property Damage**, one or more accidents arising out of a single act or causes within a community or a series of related acts or causes, regardless of the number of affected communities shall be treated as a single **Occurrence** . . .

Per its terms, the second SOC endorsement has two separate functions: (1) to identify which particular claims can be combined or "batched" together for purposes of ascertaining how many "occurrences" and SIRs apply in multi-home claims scenarios, and (2) once it is determined how many claims

17

should be treated as a single "occurrence", the endorsement identifies when all of the "property damage" involved in that single "occurrence" shall be deemed to have taken place.

The "batching" feature is set forth in the first sentence of the endorsement and can be broken down into three sub-parts: (1) "one or more accidents", (2) "arising out of a single act or causes within a community"; and (3) "or a series of related acts or causes, regardless of the number of affected communities." The third sub-part is most relevant to the parties' dispute over the impact of the SOC endorsement. The question here is whether, as a matter of law, the inspected stucco claims "arise out of . . . a series of related acts or causes" thereby satisfying the batching feature included in the SOC endorsement.

While "related" and "series of related acts" are broad terms, the Court finds that they are not ambiguous when applied to the circumstances of this case. See Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co., 855 P.2d 1263, 1275 (Cal. 1993) (analyzing "related" and "series of related acts" language in the context of a professional liability policy). "The proper question is whether the word [and phrase] is ambiguous in the context of this policy and the circumstances of this case." Id.

The words "series" and "related" are not defined in the 2017–18 AIG policy. Texas law directs courts to consult common dictionary definitions in this

instance.  <u>Pharr-San Juan – Alamo Ind. Sch. Dist. v. Texas Political Subdivisions</u>

<u>Prop. Cas. Joint Self Ins. Fund</u>, 642 S.W.3d 466, 474-475 (Tex. 2022).  The

Cambridge dictionary defines "series" as "a number of similar or related events or

things, one following another."  <u>See</u> "Series", <u>Dictionary.Cambridge.org</u>.  Other

dictionaries contain similar definitions.[5]  Most definitions define "series" to

include "related", which also appears in the policy language following the term

"series."  Given their commonly-understood definitions, use of both "series" and

"related" appears redundant.  Accordingly, the phrase can be shortened for

interpretive purposes to "related acts or causes."  "Related", in turn, is defined as

"connected by reason of an established or discoverable relation."  <u>See</u> "Related",

<u>Merriam-Webster.com</u> (emphasis added); <u>see also</u> <u>Collinsdictionary.com</u>

("connected or associated, as by origin or kind") (emphasis added).  Per the

definitions, the term "related" is an adjective that in its plain, ordinary and

generally accepted sense describes something that is "connected" or "associated"

with another thing.

   Citing dictionary definitions substantially similar to the definitions

quoted above, Texas courts have concluded that "related" means having a "logical

---

[5] <u>See, e.g.</u>, "Series", <u>Collinsdictionary.com</u> (" a group or number of *related* or similar persons, things or events, coming one after the other…" (emphasis added)); Merriam-Webster.com, ("a number of things or events *of the same class* coming one after the other…" (emphasis added)).

or causal connection" Columbia Cas. Co. v. CP Nat'l, 175 S.W.3d 339, 347–48

(Tex. App.—Houston[1st Dist.], no pet.)(noting definition of "related" in liability

policy was case of first impression in Texas); see also Comm.. Underwriters Ins.

Co. v. Royal Surplus Lines Ins. Co., 345 F. Supp.2d 652, 666-67 (S.D. Tex. 2004)

(Southern District of Texas court adopted Columbia Casualty definition of

"related" and concluded that injury-causing events at issue had both logical and

causal connections.)  Moreover, other courts have stressed that this definition of

"related" is set forth in the disjunctive, not the conjunctive.  Acts or omissions can

be either logically connected or causally connected—satisfaction of either one will

suffice to meet the definition.  See, e.g., WestRock, C.P., LLC v. Lexington Ins.

Co., 2024 WL 4543006at *8–9 (Ill.Ct.App. 1st Dist. October 22, 2024 unreported)

(rejecting application of only the "causally related" prong when interpreting term

"related" in insurance policy).

        Here, the Court finds that the stucco claims are both logically and

causally connected.  First, each stucco claim involves a complaint concerning the

stucco component of the affected home.  Further, Meritage has provided

uncontested evidence that two ASTM (American Society for Testing and

Materials) construction standards governing proper creation and installation of

stucco product in residential homes, ASTM C 926 and ASTM C 1063 have been

incorporated into residential construction building codes across the country,

including Florida and Texas.  (Dkt. # 62 at 23.)  Each stucco claim involves

violations of ASTM C 926 and ASTM C 1063, in connection with the preparation

and installation of a home's stucco system.  (Id.)

Meritage also has provided evidence that most of the stucco claims

have been supported by a single engineering consulting firm and about 72% of the

stucco claims have been handled by two Florida law firms, resulting in a "cottage

industry" of sorts.  (See id.)  While the emergence of a cottage industry does not

require the conclusion that the claims are causally related, the Court acknowledges

that this fact does support the conclusion that the claims are, at minimum, logically

related.  Because all claims involve stucco defects and involve allegations

regarding the same ASTM violations, the Court finds that they are sufficiently

connected to be considered "related" under the SOC endorsement.

While the Court recognizes AIG's contention that there are many

differences between the claims, such as the use of different subcontractors and

diversity in resulting damage, the Court finds that these distinctions are not

significant enough to overcome the broad requirement under the policy that the

claims "arise out of . . . a series of related acts or causes."  See Nobilis Health

Corp. v. Great American Ins. Co., 2018 WL 4810840, *8 (S.D. Tex. 2018) ("Even

if the 'Wrongful Acts' in the lawsuits are not identical, they are at least, 'Related

Wrongful Acts'…").

Accordingly, the Court finds that Meritage is entitled to summary judgment in the form of a declaration that, by operation of the SOC endorsement in the 2017–18 AIG Policy, all stucco claims for which there was "property damage" occurring during the 2017–18 policy constitute a single "occurrence."[6]

E.    Deeming Clause Under the SOC Endorsement

Meritage seeks summary judgment as it relates to the "deeming clause" under the second SOC endorsement.  Specifically, Meritage asks the Court to declare that per the "continuing and progressively deteriorating damage" timing provision in the 2017–18 policy, the stucco claims' property damage will be deemed to have exclusively occurred in the 2006-07 AIG policy period.  Meritage contends that testimony by its expert, Mr. Zier, supports this conclusion because the two earliest close of escrow dates in the stucco claims are March 10, 2006 and December 5, 2006, and Zier opines that those homes "began experiencing stucco distress, moisture intrusion and progressive resultant damage soon or not long after construction was complete."  (Dkt. # 62 at 26.)  Accordingly, Zier concludes that the first damage for the stucco claims likely commenced sometime between

---

[6] The Court notes that Meritage also seeks, as part of this declaration request in its Motion, that claims constituting a single "occurrence" be "deemed to have occurred at some point during the 10/1/08-09 to 10/1/14-15 AIG Policies."  (See Dkt. # 34 at 14–15.)  However, Meritage fails to explain in its Motion why this is the relevant time period.  Accordingly, the Court declines to grant Meritage that requested relief at this time and grants only a declaration that the stucco claims constitute a single occurrence.

October 2006 and October 2007. (Id.) These dates correspond with the 2006–07 AIG policy. Thus, Meritage contends that under the relevant language in the deeming clause of the SOC endorsement ("all such damage shall be deemed to take place during our first policy period during which such damage first commenced"), the inspected stucco claims are deemed to have exclusively occurred during the 2006-07 AIG policy period.

However, the Court notes that in its Second Amended Complaint, Meritage failed to request this relief, and no further amendment has been sought or permitted.[7] Thus, to the extent Meritage seeks summary judgment declaring that the underlying damage is deemed to have occurred during the 2006–07 policy period, the Court declines to grant such relief. Courts may not grant declaratory relief beyond the scope of the pleadings unless the issue is tried by express or implied consent. See Mt. Hawley Ins. Co. v. HCS 410 Holdings, LLC, 2021 WL 1550352, at *3 (W.D. Tex. Apr. 20, 2021) ("This Court cannot provide relief through summary judgment that is not requested in the Complaint."). Accordingly, Meritage's Partial Motion for Summary Judgment is **DENIED** as to its request for

---

[7] Instead, as noted above it appears Meritage requested in its Complaint that claims constituting a single "occurrence" be "deemed to have occurred at some point during the 10/1/08-09 to 10/1/14-15 AIG Policies."

a declaration that the deeming clause in the SOC endorsement deems all stucco

claim damage to have exclusive occurred in the 2006–07 policy period.[8]

### F.    Satisfaction of Self-Insured Retention

The final requirement of the Insuring Agreement that must be met

before coverage is triggered provides that AIG is only responsible for "those sums

in excess of the Self-Insured Retention."  (Dkt. # 62 at 27.)  Thus, Meritage

appears to seek summary judgment in the form of a declaration that AIG's

coverage obligations are presently and fully triggered for any of the inspected

stucco claim settlements in excess of $3 million, as well as any future settlements

or adverse judgment or awards on the inspected stucco claims.  (See Dkt. # 62 at

28.)  However, the Court again notes that this is not the relief that Meritage

requested in its Second Amended Complaint.  Instead, Meritage sought a

declaration that the following qualify as "Loss" that properly serves to erode the

applicable SIR under any of the Policies: (1) settlement of any underlying stucco

claims that involve payment of money by Meritage directly to the homeowner or

the homeowner's attorney; (2) any adverse judgments or arbitration rulings against,

and paid by, Meritage in connection with any underlying stucco claims; (3) a

---

[8] The Court notes that it does not appear necessary to decide this issue in order to determine that the SIR provision in the Policies has been satisfied. The maximum SIR among any of the Policies is $3 million and it is undisputed that the settlements paid out by Meritage to homeowners exceed $11 million.

certain percentage, varying by AIG Policy, of fees or expenses to defend any "Suit" or investigate any claim alleging a "Loss" covered by the AIG Policies paid by Meritage, by insurance specifically purchased by Meritage to be underlying insurance to the AIG Policies, or by "Other Insurance". (Dkt. # 34 at 15–16.) Accordingly, the Court will limit its analysis to the relief actually sought by Meritage in its Complaint.

The 2017–18 policy contains the following applicable provisions and definitions as it pertains to the SIR:

### III. SELF-INSURED RETENTION

A. Coverage applies only in excess of the **Self-Insured Retention** and only for those coverages listed in the Self-Insured Retention Schedule referenced in Item 4 of the Declarations.

B. Each Occurrence, Self-Insured Retention, and Aggregate Self-Insured Retention, if any, shown in the Self-Insured Retention Schedule referenced in Item 4 of the Declarations will only be reduced or exhausted by the payment of **Loss.**

* * * * *

C. The Self Insured Retention applies whether or not there is any available Other Insurance carried or paid for by the Insured. **Loss** covered under this policy paid by the Insured or by insurance specifically purchased by the Insured to be underlying insurance to this policy may be applied to reduce or exhaust the Self Insured Retention on a dollar for dollar basis. Additionally, fees and expenses paid to defend any Suit or to investigate any claim alleging a Loss covered under this policy paid by the Insured or by insurance specifically purchased by the Insured to be underlying Insurance to this policy, or by Other Insurance, will be applied to reduce up to 25% of the Self Insured Retention on a dollar for dollar basis.

\* \* \* \* \*

Y. **Self-Insured Retention** means the amount applicable to each
**Occurrence** for which the **Insured** is responsible that is shown in the
Self-Insured Retention Schedule referenced in Item 4. Of the
Declarations.
                                \* \* \* \* \*

N. **Loss** means those sums actually paid as judgments and settlements.


                        \* \* \* \* \*

(Dkt. # 62 at 27.)

      Reading Sections B and C of the SIR provision with the definition of

"Loss", the policy makes clear that the SIR can be properly eroded by covered

judgments or settlements paid by Meritage.  In this regard, the parties do not

dispute that Meritage has paid to homeowners or their attorneys at least $11 million

in settlement of stucco claims.  AIG's argument that Meritage did not technically

"pay" those settlements because it later asserted third-party claims against stucco

subcontractors and was "reimbursed" for those settlements is unpersuasive.  This

argument ignores the plain language of the SIR provision, which merely requires

that "Loss" is "paid by" Meritage.  The Texas Supreme Court has emphasized

repeatedly that faithful credence should be given to the parties' intent through the

words included in an insurance policy.   Anadarko Petroleum Co. v. Houston Cas.

Co., 573 S.W.3d 187, 192 (Tex. 2019) ("We look to the policy's language because

it best represents what the parties actually intended.").  Any events transpiring after

the settlements were "paid" do not alter the fact that itself Meritage made direct payments in settlement of stucco claims. AIG's argument would be persuasive if the relevant provision had additional qualifying language stating that payments made by the insured must be "unreimbursed" or "borne solely by the insured." However, the parties chose not to insert such language. As such, the Court cannot not rewrite the policies to conform to AIG's chosen interpretation. See Great Am. Ins. Co. v. Primo, 512 S.W.3d 890, 893 (Tex. 2017) ("We also refuse to insert language or provisions the parties did not use or to otherwise rewrite private agreements").

Accordingly, the Court finds Meritage is entitled to summary judgment that the following qualify as "Loss" that properly serves to erode the applicable SIR under any of the Policies: (1) settlement of any underlying stucco claims that involve payment of money by Meritage directly to the homeowner or the homeowner's attorney; (2) any adverse judgments or arbitration rulings against, and paid by, Meritage in connection with any underlying stucco claims; (3) a certain percentage, varying by AIG Policy, of fees or expenses to defend any "Suit" or investigate any claim alleging a "Loss" covered by the AIG Policies paid by Meritage, by insurance specifically purchased by Meritage to be underlying insurance to the AIG Policies, or by "Other Insurance".

G.    <u>Breach of Contract Claim</u>

Finally, Meritage seeks summary judgment on its breach of contract claim.  Meritage contends that AIG has breached its contractual obligations under the Policies by refusing to participate in settlement negotiations or fund any settlements as it relates to certain inspected stucco claims relating to subcontractors in Florida that are effectively uninsured and have no assets.  (<u>See</u> Dkt. # 62 at 30.) Meritage has provided unrebutted evidence that it presented the claims to AIG and requested AIG participate in the settlement negotiations and fund the settlements in light of Meritage's contention that the applicable single $3 million SIR had long been satisfied.  (<u>Id.</u>)  Meritage contends that AIG has committed contractual breach as it relates to 32 settlements of Florida stucco claims, totaling an amount of $624,375, and AIG does not appear to contest this figure in its briefing.  Meritage explains that this damage amount represents settlements for which Meritage received no reimbursement through its subcontractor recovery efforts.  The Court finds that Meritage has demonstrated the absence of a genuine issue of material fact as it relates to its breach of contract claim.  Indeed, AIG has not meaningfully contested this claim in its briefing and instead has chosen to rely on its theory that the SIR in the Policies remained unsatisfied.  Accordingly, the Court finds that Meritage is entitled to judgment as a matter of law on its breach of contract claim.  Therefore, Meritage's motion for summary judgment on its breach of contract

claim, as it pertains to the outstanding Florida settlement payments in the amount of $624, 375 is **GRANTED.**

### H.    Evidentiary Objections

AIG objects to Exhibit B (a coverage timeline) and Exhibit I (declaration of Blake S. Evans, counsel for Meritage) attached to Meritage's Motion for Summary Judgment.  (Dkt. # 65 at 5.) Because the Court has not relied on either of these exhibits in its ruling, it declines to rule on these objections at this time and they are **OVERRULED,** without prejudice to refiling.

### II.    AIG's Motion for Summary Judgment

AIG seeks summary judgment in its favor on two primary grounds: (1) its theory that Meritage has not satisfied its SIR obligation under any of the Policies; and (2) the underlying stucco claims involve multiple "occurrences" giving rise to multiple SIR obligations by Meritage that have not been met.  As discussed above, the Court finds that Meritage has satisfied its SIR obligation by making settlement payments directly to homeowners and, under the second SOC endorsement, the stucco claims constitute a single occurrence.  Accordingly, the Court **DENIES** AIG's motion for summary judgment on these grounds. Nevertheless, the Court clarifies below why it finds AIG's position on each of these issues to be unpersuasive.  Finally, the Court addresses AIG's request for summary judgment regarding its duty to defend under the Policies.

29

A.    Satisfaction of Self-Insured Retention

AIG correctly observes that it is Meritage's burden to establish the exhaustion of an SIR.  See D.R. Horton, Inc. v. Am. Guar. & Liab. Ins. Co., 864 F. Supp. 2d 541, 548 (N.D. Tex. 2012) (the policyholder has the burden to establish that SIRs have been exhausted by payment of claims covered by the policy).  As explained above, the Court finds that Meritage has carried its burden.  The Court further finds that AIG has not provided support for its contention that the settlement payments made by Meritage directly and later reimbursed by subcontractors as a result of Meritage's contractually negotiated rights fail to exhaust the SIR.

AIG asks the Court to read language into the Policies that simply is not present.  Under Texas law and Fifth Circuit precedent, the Court cannot do so. In Continental Casualty Co. v. North American Capacity Ins. Co., 683 F.3d 79, 90 (5th Cir. 2012), the Fifth Circuit was confronted with the interpretation of an SIR requiring that it simply be "paid" prior to the carrier's indemnity obligation arising. Id. at 90.  The Fifth Circuit noted that in the absence of any other qualifying or limiting verbiage, the carrier could not escape its obligation by pointing to the fact that the SIR amount was paid by other carriers, rather than the insured itself.  Id. Other Texas federal courts have followed Continental Casualty and similarly held that if a carrier desires to prohibit payment of a SIR by certain sources, then it must

negotiate for a contract that includes that requirement.  See, e.g., Zurich Am. Ins. Co. v. Centex Corp., 373 F.Supp.3d 692, 700 (N.D. Tex. 2016) ("[L]ike the SIR provision . . . in Continental Casualty, [the deductible provision at issue] contains no limitation on the ability of [the insured] or [other entities] . . .to pay" the relevant amount); American Economy Ins. Co. v. Scottsdale Ins. Co., 2015 WL 12764955 *15 (S.D. Tex. Oct. 29, 2015) (lacking explicit provision prohibiting satisfaction of a retention by other entities, SIR may be satisfied by another carrier).  By the clear, unambiguous language of the Policies, there is no express prohibition against Meritage eroding the SIR by making direct payments to homeowners and then receiving separately recovered funds from subcontractors for those settlements.

The Court acknowledges AIG's contention that the inclusion of "Other Insurance" as a delineated qualifying payment towards the portion of the SIR permitted to be eroded by defense costs, but omission of "Other Insurance" as a delineated qualifying payment towards "Loss" supports its argument.  However, even assuming *arguendo* that payments by subcontractor carriers on Meritage's third-party claims would qualify as "Other Insurance"[9] AIG's "proscription by

---

[9] The 2017–18 policy defines "Other Insurance" as a "policy of insurance providing coverage for damages covered in whole or in part by this policy." (Dkt. # 62-4.)  The Court notes that Meritage contends that while its separate third-party claims are typically funded by subcontractor carrier(s), the payments are being made on behalf of the subcontractor.  (Dkt. # 68 at 4.)

omission" argument, has been soundly rejected by the Fifth Circuit and multiple

Texas federal courts, as noted above.  See Continental Casualty Co, 683 F.3d  at

90.  Accordingly, the Court finds AIG is not entitled to summary judgment on this

issue.

      B.    Multiple Occurrences

      Next, AIG contends in its Motion that the stucco claims must be

apportioned by policy year and state, resulting in multiple occurrences and

therefore multiple SIR obligations that have not yet been met.

      The Insuring Agreement provides that "property damage" must occur

either during the policy period *or* within the lesser of the applicable limitations

period of 10 or 12 years from the COE date.  (Dkt. # 62 at 15–16).  Use of the term

"or" clearly denotes that both timing provisions are set forth in the alternative—

either one can be used to trigger the policy.  See LCS Corrections Svcs., Inc. v.

Lexington Ins. Co., 800 F.3d 664, 670–71 (5th Cir. 2015) ("inclusion of 'or' after

[a policy provision's subparts] demonstrates that the [provision] is written in the

disjunctive, and each subpart must be considered separately") (citation omitted).

Despite this, AIG appears to exclusively rely on the COE timing provision to

support its conclusion that each "occurrence" is limited to stucco claims for which

the home at issue closed escrow in the relevant policy year.  While it is true that the

Insuring Agreement states that a policy *can* be triggered by homes that close

escrow during the policy period, the plain language clearly indicates that is not the only method for determining covered property damage.  Property damage that occurs *during* a policy period is also sufficient.  As discussed above, Meritage's expert provided un-rebutted testimony that the property damage underlying the stucco claims continued into the 2017–18 policy term.  Further, AIG's argument that property damage for all homes closing escrow prior to 2017 *commenced* prior to that year is immaterial.  As discussed above, the SOC endorsement provides for batching of  inspected stucco claims that "arise out of . . . a series of related acts or causes" into a single occurrence.  As such, the fact that some of the stucco claims commenced prior to the 2017–18 policy term does not require a finding that those claims *only* occurred during the policy term in which damage commenced.

Finally, the Court finds unpersuasive AIG's contention that the deeming provision[10] of the SOC endorsement independently requires allocating stucco claims solely to the policy year in which the affected homes closed escrow. As discussed above, the deeming provision determines in which policy year

---

[10] To reiterate, this provision from the SOC endorsement provides: "In the event of continuing or progressively deteriorating damage over any length of time arising out of or affecting one or more Units or Common Areas for which the Insured has paid us a premium to cover under a policy of insurance *and which closed escrow* during our Policy Period or the policy period of any policy issued by us to which this policy serves as a renewal or succeeds in time, all such damage shall be deemed to take place during our first policy period during which such damage first commenced." (Dkt. # 62 -4.) (emphasis added)

property damage is "deemed" to have first commenced.  However, the reference in

the deeming provision to "close of escrow" pertains only to which units would be

subject to the deeming provision's back-dating impact.  Thus, the reference to

"close of escrow" simply does not do the work that AIG maintains it does.  There

is no language in the deeming provision that supports AIG's argument that the

SOC enforcement works only to batch claims into a year-long occurrence, based

solely on when units closed escrow.  Instead, as the Court has already found, the

SOC endorsement attached to the 2008–09 through 2017–18 policies operates to

batch all "related" stucco claims to which those policies apply into a single

occurrence.

       Furthermore, to the extent AIG contends that this reading of the SOC

endorsement conflicts with other language included in the Policies, the Court finds

that the SOC endorsement supersedes.  While endorsements should be construed in

the context of the entire policy, Texas law is clear that if an endorsement conflicts

with other policy terms, the endorsement will supersede and govern.  See CBX

Resources, LLC v. Ace American Insurance Co., 282 F.Supp.3d 948, 959 (W.D.

Tex. 2017) (explaining rule that endorsements supersede conflicting language in

main policy); see also Mid-Continent Cas. Co. v. Bay Rock Operating Co., 614

F.3d 105, 115-116 (5th Cir. 2010) (rejecting carrier's reliance on exclusions in

policy form because carrier's "interpretation would cause an irreconcilable conflict

between the exclusion and the additional coverage" provided by an endorsement); Starr Indem. & Liability Co. v. SGS Petroleum Svc. Corp., 719 F.3d 700, 704 (5th Cir. 2013) (enforcing notice provision in "a specific endorsement, separately negotiated by the parties" rather than notice provision in the policy form). Moreover, the SOC endorsement contains a clear preamble indicating that the parties intended for the endorsement to supersede any other conflicting policy language.

Finally, the Court finds unpersuasive AIG's argument that the Texas and Florida stucco claims should be batched into separate occurrences by virtue of the claims arising from homes that were built in two different states. As discussed above, the stucco claims are "related" under the terms of the Policy because all underlying stucco claims stem from a consistent defective installation practice (specifically a failure to comply with two ASTM construction standards, C 926 and C 1063).

C.    Duty to Defend

AIG seeks summary judgment in its favor on its duty to defend. Meritage does not contest this request. The Court agrees with AIG that pursuant to the Policies, if an SIR is exhausted by payment of "Loss," then AIG has the right, but not the duty to defend any stucco suit against Meritage that seeks damages covered by the Policies. Accordingly, the Court **GRANTS** AIG's motion for

summary judgment as to its request for a declaration that, under the Policies, AIG does not have a duty to defend.

<u>CONCLUSION</u>

For the reasons stated, the Court **GRANTS IN PART AND DENIES IN PART** Meritage**'s** Partial Motion for Summary Judgment (Dkt. # 62)  and **DENIES IN PART AND GRANTS IN PART** AIG's Motion for Summary Judgment (Dkt. # 61).

**IT IS SO ORDERED.**

**DATED**: Austin, Texas, July 8, 2025.

_____
David Alan Ezra
Senior United States District Judge